**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**LINDA MCCABE**,

        Plaintiff,

v.        No. CIV 04-992 BB/WDS

**UNITED PARCEL SERVICE, ET AL.**,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court for consideration of a motion for summary judgment (Doc. 66) filed by Defendants. The Court has reviewed the submissions of the parties and the relevant law. For the reasons set forth below, Defendants' motion for summary judgment will be granted in part and denied in part.

This case arises out of Plaintiff's prior employment with Defendant United Parcel Service ("UPS"). Plaintiff alleges she was subjected to a severe incident of sexual harassment, including unwanted and disturbing physical contact, by a customer during the course of her employment. Plaintiff also maintains this incident caused her to be diagnosed with post-traumatic stress disorder ("PTSD"), which disabled her as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. Eventually, after Plaintiff was off work for a year, she was "administratively separated" from her employment with UPS. Plaintiff then brought this lawsuit alleging Defendants violated the ADA in several ways in their treatment of her. She also claims Defendants retaliated against her in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.;* breached the terms of a mediation agreement entered into following mediation presided over by the Equal Employment Opportunity Commission ("EEOC"); and breached an implied contract of employment in several ways. Plaintiff

originally raised a claim under ERISA, the federal law governing pensions and employer-provided insurance plans, 29 U.S.C. §§ 1001 *et seq.*, but has abandoned that claim during the summary-judgment briefing process.  Defendants have moved for summary judgment on all remaining claims. The Court will refer to Defendants and UPS interchangeably in this opinion.         "Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.*  On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995).  Furthermore, where as in this case a motion to dismiss requires the Court to consider matters outside the pleadings, the motion to dismiss should be addressed in the same manner as a motion for summary judgment. *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991) ("Generally, a district court must convert a motion to dismiss into a motion for summary judgment when matters outside the pleadings are relied upon.") The Court will consider Defendants' motion in light of these standards, addressing the more straightforward issues first and then discussing the more complicated questions presented by this case.

**Breach of Implied Employment Contract:** Plaintiff maintains that UPS breached a number of contractual promises that are implied by various provisions of the UPS Policy Book, the UPS Code of Business Conduct, the UPS Guidelines for Investigating Workplace Issues, the UPS ADA

Procedural Compliance Manual, and other UPS publications setting out company policies and procedures. The alleged breaches of implied contract committed by UPS include the following: (1) failing to follow correct procedures in responding to Plaintiff's requests for accommodation under the ADA, or to her complaints of discrimination and retaliation; (2) failing to adequately investigate Plaintiff's allegation of sexual assault by a customer, or to properly respond to that incident; and (3) failing to consider any type of accommodation for Plaintiff's disability, and then terminating her employment.

Plaintiff's implied-contract claims fail for two reasons. First, while Plaintiff points to a number of provisions in the various policy manuals which, according to Plaintiff, make enforceable promises entitling Plaintiff to certain procedures, she points to no provision that alters her at-will status as a UPS employee. In other words, she has not specified any provision (and the Court has found none) that limits the ability of UPS to terminate her employment. For example, there does not appear to be a provision requiring that good cause exist to support such a termination, or that certain specific procedures be followed prior to such action. Under New Mexico law, however, if an employee remains an at-will employee she has no right to enforce any promise made by an employer concerning present or future treatment by the employer. *See Miller v. Automobile Club of New Mexico*, 420 F.3d 1098, 1130 (10th Cir. 2005) (construing New Mexico law to mean that an at-will employee cannot enforce a promise made by the employer to promote the employee); *Gormley v. Coca-Cola Enterprises*, 85 P.3d 252, 259 (N.M. App. 2003) (if employee was at will, he could not enforce implied contract concerning hours and duties); *Stieber v. Journal Publishing Co.*, 901 P.2d 201, 204 (N.M. App. 1995) (power to terminate at will necessarily includes power to modify conditions of employment; no breach of contract action may lie where employer may prospectively change conditions of employment at will). Given Plaintiff's status as an at-will employee, she cannot maintain a breach-of-contract action for violations of the implied contract terms allegedly requiring

3

UPS to follow various procedures with respect to Plaintiff's disability, retaliation, and accommodation claims.

The second reason Plaintiff's implied-contract claims fail is the nature of the "promises" she relies on as the bases for those claims. "General policy statements of a non-promissory nature contained in an employee handbook are insufficient to create an implied contract." *Stieber*, 901 P.2d at 205. The fact that UPS has chosen to establish certain procedures that should be followed when an employee complains of sexual harassment, or requests accommodation for a disability, does not make those procedures a matter of contractual entitlement. There is simply not the type of specificity here as there is in a case involving an implied promise not to terminate an employee except for good cause. New Mexico cases have recognized that an implied contract can exist in the termination context, as well as in situations involving specific employment conditions such as hours of work and rate of pay. *See Gormley*, 85 P.3d at 259. However, the Court holds that New Mexico would not recognize a contractual right of the type claimed by Plaintiff in this case, where an employer has simply established procedures for dealing with issues that can arise in the workplace.

**Discrimination/Retaliation Claims Arising Prior to September 24, 2002:** Many of Plaintiff's claims concern actions taken by Defendants immediately following the sexual assault, which occurred in December 2001. Plaintiff claims UPS retaliated against her for reporting the assault by denying her a raise, requiring her to keep a detailed time log, unjustifiably disciplining her by holding her out of work for several weeks (albeit with pay), and harassing her in other ways (including forcing her to drive to Santa Fe, the location of the assault, despite the detrimental effect on her emotional and physical health). In August 2002, Plaintiff filed an EEOC charge complaining about many of these alleged acts of retaliation. [UPS Exh. 24] Subsequently, Plaintiff and UPS participated in mediation proceedings and reached an agreement memorialized in a document dated September 24, 2002, and signed by the mediator, an EEOC official, Plaintiff, and a representative of UPS. [UPS

Exh. 25] In this agreement Plaintiff agreed not to institute a lawsuit based on any of the acts complained of in the August 2002 EEOC charge. The law is clear that such agreements are contracts that are enforceable, and bar any subsequent Title VII or ADA claim based on the acts alleged in the settled charge. *See, e.g., Snider v. Circle K Corp.*, 923 F.2d 1404, 1407 (10th Cir. 1991); *Johnson v. Washington Gas Light Co.*, 404 F.Supp.2d 179, 181 (D.C.D.C. 2005); *Cantu v. Brownsville Navigation Dist.*, 2005 WL 2600441 (S.D. Tex. unpublished).[1] The only actions by Defendants that will be considered by the Court in this opinion, therefore, are those that are not covered by the mediation agreement. This means Plaintiff's Title VII retaliation claim must be dismissed, because it is based on the actions Defendants took in the weeks and months following the December 2001 incident, but before the mediation agreement was signed.

**Breach of Mediation Agreement:** Plaintiff maintains UPS breached the following provision of the mediation agreement: "It is the intent of the parties that Ms. McCabe will return to work as soon as possible, subject to medical restrictions as recommended by her treating physician and UPS' operational needs, including but not limited to her ability to perform the essential functions of her position." [UPS Exh. 25] Plaintiff argues that UPS did nothing to return her to work, although at the time of the mediation agreement she was ready, willing, and able to return to work. UPS, on the other hand, contends that Plaintiff was never released to work with restrictions that would allow her to perform the essential functions of her position, until after someone else was finally hired to fill that position almost one year after the settlement agreement. UPS also argues that the settlement agreement specifically states that Plaintiff's "absence and return to work will be governed by UPS'

---

[1] Since the mediation agreement is a contract, Plaintiff is entitled to raise a claim for breach of that agreement, and has done so in this lawsuit. This claim is separate from her ADA and Title VII claims, although it arises out of such claims and is governed by federal law. *See Chavez v. State of New Mexico*, 397 F.3d 826, 830 (10th Cir. 2005). Plaintiff's claim is discussed below.

5

Flexible Benefits Plan." [*Id.*] According to UPS, this provision allowed UPS to terminate Plaintiff's employment in April 2003, after she had been off work for twelve months.

It is not possible to conclusively determine the meaning of the mediation agreement at this time, given the ambiguous language of the agreement and the lack of facts indicating the parties' intentions at the time the agreement was finalized. As Plaintiff argues, it is not clear what the phrase "subject to medical restrictions as recommended by her treating physicians" means; it could mean Plaintiff was supposed to be placed in a position that would accommodate her restrictions, or that she could not return to work until she could do so without any restrictions. It is also not clear whether the agreement contemplated returning Plaintiff only to her former position, or allowed for the possibility of placing her in an open position that she could perform under whatever medical restrictions she was subject to at the time. It is not even clear what the parties understood were the "essential functions" of Plaintiff's position. Finally, it is far from clear, and there is no evidence to support the proposition, that the general phrase making Plaintiff's absence from and return to work subject to the Flexible Benefits Plan was understood by the parties to mean that the Plan's strict 12-month limitation on an employee's ability to be off work would be applied to Plaintiff.[2]

As for the factual context surrounding the mediation agreement, it is as muddled as the vague language contained in the agreement. The only medical restriction that appears to have been in effect at the time of the agreement was Dr. Christensen's release allowing Plaintiff to return to work as of September 4, 2002, with the following restrictions: (1) no pushing or pulling over 25 pounds, due to a physical injury Plaintiff had suffered in March; (2) no lifting over 20 pounds, for the same reason; and (3) no work in Santa Fe, due to Plaintiff's PTSD. [UPS Exh. 23] At the time of her deposition, on the other hand, Plaintiff could not remember having been released to work with restrictions at the

---

[2]In addition, as discussed below, there is some question as to whether the Plan applies only to employees who are actually receiving short-term or long-term disability benefits. Plaintiff was receiving neither at the time she was terminated.

6

time of the agreement (or did not understand the question she was asked), and testified the first time she was released to work subsequent to the agreement was when Dr. Fredman allowed her to return to work with restrictions. [UPS Exh. 1, p. 361] Plaintiff also testified, contrary to her claim in her brief that she was "ready, willing, and able" to return to work, that after the agreement she was not capable of performing her duties at work until Dr. Fredman released her to do so. [*Id.*] The parties have adduced no evidence of any activity by Plaintiff or UPS, concerning the mediation agreement or Plaintiff's return to work, until April 2003, over six months after the agreement. At that point Plaintiff asked to return to work with restrictions, and UPS first denied that request and then "administratively" terminated her employment, ostensibly because she had been off work for twelve months and the Flexible Benefits Plan required such termination after that period of time. Finally, after Plaintiff applied for her old position in the summer of 2003, UPS hired someone else for the job even though Plaintiff had been fully released to work, without restrictions, before the hiring took place.[3]

    The Court finds there are factual issues concerning the interpretation of the mediation agreement, as well as the parties' performance of it, sufficient to preclude summary judgment. *See Gomez v. American Elec. Power Serv. Corp.*, 726 F.2d 649, 651 (10th Cir. 1984) ("[I]n an ambiguous contract, if the intent of the parties is disputed, a genuine issue of material fact exists

---

[3]UPS argues that Plaintiff did not reveal her full release to UPS until after the hiring had already occurred. In support of that assertion UPS cites only to findings of fact made by a workers' compensation judge. [UPS Exh. 45, p. 9] These findings, however, contain several "facts" that are contradicted by the record before this Court, and the Court therefore declines to consider them conclusive. As just one example, the judge found that Plaintiff received long-term disability benefits and was terminated from employment after those long-term disability benefits ended. [*Id.* p. 10] In fact, Plaintiff received short-term disability benefits, was denied long-term disability benefits, and was not terminated until several months after those short-term benefits ended. Furthermore, the finding of fact relied on by UPS did not concern an issue essential to the workers' compensation judge's decision, which considerably lessens its potential collateral estoppel effect. *See, e.g., Shovelin v. Central New Mexico Elec. Coop., Inc.*, 850 P.2d 996, 1000 (N.M. 1993) (collateral estoppel should be given to administrative finding only if issue was actually litigated and necessarily decided).

which cannot be determined summarily by the court."). As discussed above, it is not clear to the Court whether the parties intended, in the mediation agreement, to return Plaintiff to work only when she could perform the essential duties of her former position, or whether any acceptable position would have been sufficient. It is also not clear what the parties intended to be the essential duties of the position; whether the parties contemplated that termination would occur if Plaintiff was not able to return to work for twelve months; whether Plaintiff became able to perform all of the duties of her old position, and communicated that ability to UPS, before the position was filled by someone else; and whether the agreement required that the administrative separation be ignored, and Plaintiff re-hired for her old position, if she became able to perform it before it was filled.

**ADA Discrimination:** Plaintiff maintains that UPS discriminated against her on the basis of her disability, in violation of the ADA, by refusing to accommodate her disability. The ADA protects "qualified individuals with a disability" ("QID") from discrimination, and requires employers to provide accommodation, under certain circumstances, to such QIDs. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1160-61 (10th Cir. 1999). Plaintiff argues that UPS completely failed to offer any accommodation for her disability, such as allowing her to perform her job without traveling to Santa Fe. She also argues that UPS did not participate in the "interactive process" required by the ADA to identify possible accommodations for an employee's disability.

Before addressing the accommodation question, it is necessary to determine whether Plaintiff was a disabled person entitled to the protections provided by the ADA. A person who is disabled for purposes of the ADA is one who has a physical or mental impairment that substantially limits one or more of the major life activities. *Albert v. Smith's Food and Drug Centers, Inc.*, 356 F.3d 1242, 1250 (10th Cir. 2004). There is no question in this case that Plaintiff's PTSD constitutes a mental impairment; however, UPS argues the impairment did not substantially limit any major life activity. In response, Plaintiff contends her PTSD substantially limited her ability to sleep and to work, two

of the accepted major life activities relevant to ADA cases. The question of whether Plaintiff was substantially limited in her ability to sleep or work must be answered as of the time UPS undertook the actions about which Plaintiff complains. *See Frazier v. Simmons*, 254 F.3d 1247, 1256 (10th Cir. 2001) (determination of whether person is QID is to be made at the time of the employment decision). In this case, since the mediation agreement precludes inquiry into all employment decisions made prior to that agreement, and the Court has not been made aware of any UPS decisions made between September 2002 and spring 2003, the time period in question begins in the spring of 2003 and lasts through approximately September of 2003, as there is no evidence in the record of any UPS decisions adverse to Plaintiff after that time. Plaintiff's ability to sleep and work during the time period from April 2003 through September 2003 is thus the critical inquiry.

As to the major life activity of sleeping, the Court agrees with the argument advanced by UPS, that Plaintiff has failed to produce sufficient evidence to raise an issue of fact as to whether her difficulties with sleep rose to the level required by the ADA. The evidence relied on by Plaintiff includes the following: (1) a statement by Dr. Fredman, in his deposition, that Plaintiff's ability to sleep was impaired, and the impairment was "significant" [Pltf. Exh. Y, p. 23]; and (2) evidence that Plaintiff had nightmares, sometimes had difficulty falling asleep, sometimes woke up during the night and had difficulty going back to sleep, and took the medication lorazepam "as needed" to address the sleep problem. [*Id.* p. 24; UPS Exh. 1, p. 273] Under controlling Tenth Circuit authority, this evidence is insufficient to survive summary judgment on the sleep issue. In *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305-06 (10th Cir. 1999), a doctor characterized the plaintiff's sleep problems as "significant;" the plaintiff testified that she had difficulty going to sleep, and would then wake up shaking, crying, nervous, and upset; she also testified that she would toss and turn all night long, and sometimes get only two or three hours of sleep. The Tenth Circuit pointed out that the task for the court was to compare the plaintiff's ability to sleep as compared to the average person in the general

9

population, and noted the plaintiff had failed to present any evidence regarding such average person's ability to sleep. *Id.* at 306, fn. 7. Finally, the Tenth Circuit held the plaintiff had not presented enough evidence to allow the jury to decide whether her ability to sleep had been substantially limited or not. *Id.* Plaintiff's evidence in this case is similarly conclusory, and lacks sufficient detail to raise a genuine issue of fact as to whether Plaintiff's difficulties sleeping were significantly greater than those of an average person in the general population.

As to Plaintiff's ability to work in the spring of 2003, the applicable standard for analyzing whether she suffered substantial limitation requires the Court to determine whether there is evidence that Plaintiff was unable to work in a broad class or range of jobs at that time. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-92 (1999). It is not sufficient that Plaintiff be unable to perform her particular job, or one type of job. *Id.* Plaintiff presented evidence that on March 18, 2003, according to Dr. Fredman, she could not perform the "material and substantial duties of her regular occupation at this time." [UPS Exh. 33] On April 21, Dr. Fredman released Plaintiff to work, but limited her to working in the Albuquerque metropolitan area and to no more than 20 hours per week. [Pltf. Exh. S] Dr. Fredman noted that as Plaintiff's condition "continues to improve, I will eliminate these restrictions." [*Id.*] Later, on July 11, 2003, Dr. Fredman released Plaintiff to work full-time, with the only restriction being that she should not work in Santa Fe. [UPS Exh. 43] Finally, on August 18, 2003, Dr. Fredman released Plaintiff to work "without restrictions." [UPS Exh. 46]

Plaintiff's first request for an accommodation from UPS came on April 21, 2003, the same date Dr. Fredman released her to work part-time. [Pltf. Exh. AL] At that time, therefore, her ability to work was limited to 20 hours per week, a restriction that was lifted less than three months later.[4]

---

[4] It is actually not clear whether Dr. Fredman's notes were directed at limiting Plaintiff from working any job for more than 20 hours per week, or just her prior job. Viewing the evidence in the light most favorable to Plaintiff, the Court interprets the restriction as applying to any and all jobs.

She was also restricted to working in the Albuquerque area, a restriction that was also lifted four months later. During the relevant time period, therefore, which lasted from April 21, 2003 until some time in September (the time period during which Plaintiff periodically requested accommodations from UPS, all of which were denied), the only evidence concerning Plaintiff's inability to work is that she was limited to half-time work in Albuquerque for three months, then full-time work anywhere but Santa Fe for a month, and finally had all restrictions lifted. This evidence is simply insufficient to raise an issue of fact as to whether Plaintiff's ability to work during the period from April to September, 2003, was substantially limited. *See, e.g., Samuels v. Kansas City Missouri Sch. Dist.*, 437 F.3d 797, 801-02 (8th Cir. 2006) (fact that plaintiff was restricted to reduced work schedule for six-month period, as well as temporary period of other restrictions, was not sufficient to allow a finding that she was substantially limited in her ability to work); *cf. Shaw v. Greenwich Anesthesiology Assocs.*, 137 F.Supp.2d 48, 55 (D. Conn. 2001) (evidence that plaintiff was limited to part-time work was not sufficient to show ability to work was substantially limited). Plaintiff's temporary restrictions, which Dr. Fredman predicted would end as she improved, and which did end within four months, did not substantially limit her in performing the major life activity of work during the relevant time period.[5] Since the evidence is insufficient to raise an issue of fact as to whether Plaintiff's ability to either sleep

---

[5]Plaintiff did produce some evidence suggesting that her condition has worsened; Dr. Fredman testified at his deposition that as of December 15, 2005, Plaintiff's condition had "deteriorated" from the last time he saw her, which was apparently approximately two years before that date. [Pltf. Exh. Y, p. 90] This deterioration, Dr. Fredman speculated, was due to Plaintiff's "strong feelings" about the way she had been treated by UPS and the workers' compensation insurer. [*Id.* pp. 90-91] This evidence is not helpful with respect to the question at hand, for at least two reasons. First, it post-dates the relevant time period by over two years. *See Samuels*, 437 F.3d at 803 (evidence of a medical evaluation performed one year after the employer's decision was not relevant to the substantial-limitation issue); *cf. Frazier*, 254 F.3d at 1256 (time period for determining ADA disability is time employer took actions about which plaintiff complains). Also, it is too vague to simply say Plaintiff's condition had deteriorated, without any specific facts showing the extent of the deterioration and how that deterioration affected her ability to perform a broad class or range of jobs.

11

or work was substantially limited by her disability from April 2003 through September 2003, the evidence is also insufficient to raise an issue of fact as to whether Plaintiff had a qualifying disability during that time. Summary judgment is therefore appropriate on Plaintiff's ADA discrimination claim.

**ADA Retaliation Claim:** The fact that Plaintiff was not a QID during the time period in question does not preclude her from bringing a retaliation claim under the ADA. *See, e.g., Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001). Instead, it is sufficient if the employee had a reasonable, good-faith belief that the statute has been violated. *Id.* Defendants have not challenged Plaintiff's good-faith belief in this case, and the Court finds there is at least an issue of fact in the record as to whether Plaintiff believed she was disabled and was discriminated against on the basis of that disability. Therefore, the Court will examine the merits of Plaintiff's retaliation claim.

The elements of an ADA retaliation claim are as follows: (1) Plaintiff engaged in an activity protected by the statute; (2) Plaintiff was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse action. *See id.* Plaintiff alleges she was retaliated against after she requested accommodation on April 21, 2003, by informing UPS that she had been released to work with restrictions and stating her intention to go back to work; such a request for accommodation is protected conduct under the ADA.[6] *Cf. Butler v. City of Prairie Village, Kansas*, 172 F.3d 736, 751-52 (10th Cir. 1995) (assuming without discussion that request for accommodation is protected conduct). The alleged retaliation by UPS took several forms, including terminating Plaintiff's employment on April 25, refusing to hire her for her old position in August, and refusing to hire her

---

[6]Plaintiff also filed an EEOC claim on May 8, 2003, and another EEOC claim on August 26, 2003. [UPS Exhs. 40, 47] Such claims are, of course, protected conduct under the ADA.

for several other open positions after she applied for those positions. UPS does not argue that its actions were not "adverse employment actions" for purposes of the ADA. Therefore, the only question that must be answered with respect to this claim is whether Plaintiff has raised a genuine issue of fact as to whether retaliation was a motivation for any of UPS' actions.

It is helpful to set out a timeline of Plaintiff's protected conduct and the UPS actions about which she complains. As noted above, on April 21, 2003 Plaintiff requested accommodation by delivering a letter to UPS notifying UPS that she had been released to work 20 hours a week, as long as she could work in the Albuquerque metropolitan area, and that as her condition improved, these restrictions would be eliminated.[7] [UPS Exh. 36] Four days later, on April 25, UPS completed a "Separation Form" terminating Plaintiff's employment, stating that the reason for the action was "Health Related" and classifying Plaintiff's "Rehire Status" as "No." [Pltf. Exh. AK] Somewhere around the same time, Plaintiff had a telephone conversation with a Ms. Ecker, a human resources manager with UPS, during which Ms. Ecker informed Plaintiff that she would not be brought back if she could work only 20 hours per week and could not work in Santa Fe.[8] Ms. Ecker also informed Plaintiff that even if she returned to work part-time, the twelve-month clock of the Flexible Benefits Plan would continue ticking and she would be terminated as an employee pursuant to that plan. On April 30, UPS wrote a letter to Plaintiff informing her she was not eligible for a reasonable accommodation under the ADA, and on May 2 Ms. Ecker wrote a letter to Plaintiff informing Plaintiff that her "Short Term Disability Benefits (STD) ended on April 25, 2003" and that since she had been off work for more than twelve months, her employment was "administratively terminated."

---

[7]It appears Plaintiff faxed this letter to UPS, or delivered it on the same day it was written, because Plaintiff and a Ms. Estes of UPS had a telephone conversation about the letter on that same day. [UPS Exh. 51]

[8]The exact date of this conversation is not available, but the content of the transcript indicates it was a day or two after Plaintiff's telephone conversation with Ms. Estes. [UPS Exh. 52]

13

[UPS Exhs. 38, 39] Plaintiff then filed an EEOC claim protesting her termination and UPS' refusal to rehire her, on May 9.  In June Plaintiff expressed interest in her old position, and applied for the position in July.  [Pltf. Exh. D, Ecker dep. pp. 93-94]  In August, after Plaintiff was released to work without any restrictions, UPS hired someone else for the position, despite the fact the person hired had no experience performing Plaintiff's job.  [*Id.* p. 43-45][9]  UPS explained that Plaintiff, who was no longer an employee, was at a disadvantage because UPS has a policy of promoting from within wherever possible.  [*Id.*]  Plaintiff then filed another EEOC claim on August 26, applied for three different positions in September (all of which would have been promotions), and was refused each of these positions.  [UPS Exh. 47; Pltf. Exh. AD; Pltf. Exh. E, p. 106-07]

In summary, Plaintiff requested accommodation for her restrictions and her doctor stated it was likely those restrictions would be lifted as her condition improved; she was refused accommodation within ten days and terminated from her employment within four days; the termination notice specifically stated she was not eligible for rehire, and in addition caused her to be ineligible for UPS' hire-from-within policy; and she was denied rehire into her former position in favor of an in-house employee with no experience in the position.  It appears to the Court that, at least for summary-judgment purposes, the legitimacy of UPS' actions primarily depends on the legitimacy of the administrative termination, which severely impacted Plaintiff's ability to regain employment with UPS.  For summary-judgment purposes, it is important to note the extremely short time period of four days between Plaintiff's protected conduct, the request for accommodation, and the adverse employment action.  *See Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (in First Amendment retaliation case, noting that such extremely short time period can be enough, standing alone, to survive summary judgment on causation question).  UPS bears a heavy burden,

---

[9]The Court notes again there is a question of fact as to whether UPS knew Plaintiff's restrictions had been removed at the time UPS hired the other applicant rather than Plaintiff.  The Court must view this factual dispute in the light most favorable to Plaintiff.

therefore, to show there is no genuine issue of material fact as to whether there was a causal connection between Plaintiff's request to come back to work and her termination. *See Selenke, supra*, 248 F.3d at 1264 (stating elements of ADA retaliation claim, including causal-connection requirement).

UPS relies on its Flexible Benefits Plan, which has a provision stating essentially that regardless of an employee's status regarding short-term or long-term disability ("STD" or "LTD"), the employee will be terminated after being off work for twelve months. As Plaintiff argues, however, the Plan appears to apply to employees who are receiving either STD or LTD, as opposed to employees who are off work for other reasons. [UPS Exh. 26, Plan booklet] Although Ms. Ecker did testify there is a UPS policy that an employee's combined STD and other time off work cannot exceed twelve months, she did not know if this policy is written down anywhere. [UPS Exh. 7, pp. 69-70] The only other reference the court could find to an absence of twelve months or more was deposition testimony by Mr. Lorenzen, who stated it is "fairly common knowledge" that if an employee is absent for twelve months, the employee will be administratively separated. [Pltf. Exh. F, p. 29] The Court finds these vague references to an unwritten policy, combined with the mere possibility that the Flexible Benefits Plan might apply even to employees who are not receiving STD or LTD, are not sufficient to show conclusively that an automatic termination is required any time an employee is off work for twelve months or more. The Court also notes the statement on the notice of administrative separation, to the effect that Plaintiff was not eligible for rehire. [Pltf. Exh. AK] UPS has pointed to no reason for classifying Plaintiff in such a manner, and there is no evidence one way or the other as to how such classification might have affected the later employment decisions UPS made. For all these reasons, the Court finds Plaintiff has produced sufficient evidence to raise an issue of fact as to whether UPS' justifications for its termination, and therefore at least some of its subsequent actions, were a pretext for retaliation. *See Selenke, supra*, 248 F.3d at 1264 (when

employer articulates a non-retaliatory reason for its actions, burden is on plaintiff to produce evidence tending to show that reason is pretextual). Summary judgment is not appropriate on the ADA retaliation claim.

**Punitive Damages:** The Court finds a reasonable jury could, depending on what facts the jury believes, find the necessary predicates for an award of punitive damages in this case. Summary judgment will therefore not be granted on the issue of punitive damages.

**Conclusion:** As discussed above, Plaintiff may not complain in this lawsuit about any of the events that were the subject of her original EEOC claim, which was mediated and settled. Furthermore, she has abandoned her ERISA claim, her breach-of-implied-contract claim fails to state a claim, and she has not established that she was disabled, for ADA purposes, from April to September 2003. The motion for summary judgment will therefore be granted as to the ERISA claim, the breach-of-implied-contract claim, the Title VII retaliation claim, and the ADA discrimination claim. The motion will be denied as to the breach-of-mediation-agreement claim and the ADA retaliation claim.

## ORDER

Based on the foregoing memorandum opinion, Defendants' motion for summary judgment (Doc. 66) is hereby GRANTED in part and DENIED in part.

Dated this 24th day of August, 2006.

BRUCE D. BLACK
United States District Judge

**ATTORNEYS**:
**For Plaintiff**:
Michael E. Mozes
**For Defendants**:
David T. Barton, Deanna R. Rader, Stan N. Harris